UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA            :

        - v. -            :   96 Cr. 1123 (SHS)

ALFRED WHITE,            :

        Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S MOTION FOR COMPASSIONATE
RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) AND MOTION UNDER 28 U.S.C. § 2255
TO VACATE THE JUDGMENT**


AUDREY STRAUSS
United States Attorney
Southern District of New York
Attorney for United States of America


Jane Y. Chong
Assistant United States Attorney
    - Of Counsel -

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................. iv

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

      A.      The Indictment ................................................................................... 2

      B.      The Evidence at Trial ......................................................................... 3

      C.      The Verdict and Sentence ................................................................. 6

      D.      The Defendant's Appeal and Section 2255 First Petition................. 6

      E.      The Instant Motion............................................................................ 7

ARGUMENT ................................................................................................................. 9

**I.  The Defendant Is Not Entitled to a Sentence Reduction under Section 3582.** ................ 10

      A.      COVID-19 is not an extraordinary and compelling reason to release the fully vaccinated defendant. ..................................................................... 10

      B.      The defendant's alleged rehabilitation is not an extraordinary and compelling reason for a sentence reduction. ................................................. 12

**II.  The Defendant Is Not Entitled to Vacatur under Section 2255.** ..................................... 15

      A.      The defendant's *Davis* claim fails to satisfy the threshold requirements governing successive Section 2255 motions. ................................. 15

      B.      Postal robbery under Section 2114(a) remains a valid Section 924(c) predicate after *Davis*.................................................................................. 16

          1.     The defendant's conviction for assaulting a postal worker and "in effecting or attempting to effect such robbery . . .  put[ting] his life in jeopardy by the use of a dangerous weapon" is a valid Section 924(c) predicate. ................... 16

          2.     Aggravated postal robbery is a further divisible offense and the particular offense for which the defendant was convicted is a valid Section 924(c) predicate. ........... 18

      C.      This Court's *Pinkerton* charge does not affect the validity of the defendant's Section 924(c) convictions. ................................................... 23

**III. The Defendant Is Not Entitled to an Evidentiary Hearing to Relitigate Whether the Government Knew of George Gallego's Alleged Perjury.** ............................................. 25

    A.    The defendant's "newly discovered evidence" consisting of hearsay from the shooter does not constitute competent habeas evidence warranting an evidentiary hearing. ................................................................................................................ 26

    B.    Most of the defendant's "newly discovered evidence" either does not give rise to an inference of perjury or amounts to inconsistencies that George Gallego conceded on the stand under cross-examination. ................................................................. 27

    C.    The defendant fails to explain how his remaining "newly discovered evidence" shows the Government knew of any alleged perjury, and in any case, the testimony was plainly not prejudicial. .................................................................................. 30

CONCLUSION ..................................................................................................................... 31

## TABLE OF AUTHORITIES

**Cases**

*Flores v. Holder*, 779 F.3d 159 (2d Cir. 2015) .................................................................. 24, 25

*Gonzalez v. United States*, 722 F.3d 118 (2d Cir. 2013) ........................................... 29, 34

*Haouari v. United States*, 510 F.3d 350 (2d Cir. 2007).................................................... 31

*In re Henry*, 757 F.3d 1151, (11th Cir. 2014)..................................................................... 18

*In re Watt*, 829 F.3d 1287 (11th Cir. 2016) ........................................................................ 19

*Johnson v. United States*, 576 U.S. 591 (2015) ................................................................... 8

*Knight v. United States*, 936 F.3d 495 (6th Cir. 2019) .............................................. 19, 22

*Massey v. United States*, 895 F.3d 248 (2d Cir. 2018) ...................................................... 17

*Mathis v. United States*, 136 S. Ct. 2243 (2016)..................................... 20, 22, 23, 26

*McCullough v. United States*, No. 14 Civ. 1920, 2020 WL 869118 (E.D.N.Y. Feb. 21, 2020)... 18

*McDuffie v. United States*, No. 1:16-CV-775 (LMB), 2019 WL 3949303 (E.D. Va. Aug. 21, 2019) ................................................................................................................................ 24

*Moody v. United States*, No. 07 Cr. 139, 2020 WL 529281 (W.D.N.Y. Feb. 3, 2020) ............... 19

*Pannell v. United States*, No. 06-CR-578 (NG), 2021 WL 3782729 (E.D.N.Y. Aug. 26, 2021). 18

*Salazar-Espinosa v. United States*, No. 11 CIV. 0247 LAK, 2011 WL 2946166 (S.D.N.Y. July 11, 2011) ............................................................................................................................ 30

*Sessa v. United States*, No. 92-Cr-351 (ARR), 2020 WL 3451657 (E.D.N.Y. June 24, 2020).... 28

*Shih Wei Su v. Filion*, 335 F.3d 119 (2d Cir. 2003)......................................... 30, 34, 35

*Speed v. United States*, No. 04 CR 336 (PKC), 2020 WL 6290385 (S.D.N.Y. Oct. 27, 2020).... 21

*United States v. Alfredo Gallego*, No. 95-284, ECF No. 240 (S.D.N.Y. Aug. 19, 2021)............. 16

*United States v. Arinze Obika*, No. 20CR179 (DLC), 2021 WL 4326750 (S.D.N.Y. Sept. 22, 2021) ................................................................................................................................ 12

*United States v. Batista*, No. 18-CR-319-LTS, 2020 WL 6132239 (S.D.N.Y. Oct. 19, 2020) .... 12

*United States v. Bryant*, 949 F.3d 168 (4th Cir. 2020) ........................................... 19, 25

*United States v. Collado*, No. 14-CR-731-LTS, 2021 WL 2555838 (S.D.N.Y. June 21, 2021).. 10

*United States v. Davis*, 139 S. Ct. 2319 (2019) ............................................................. 8, 9

*United States v. Enoch*, 865 F.3d 575 (7th Cir. 2017)............................................... 19, 22

*United States v. Figueroa*, No. 15CR711 (DLC), 2021 WL 3727091 (S.D.N.Y. Aug. 20, 2021)11

*United States v. George*, 223 F. Supp. 3d 159 (S.D.N.Y. 2016) ..................................... 22

*United States v. Gluzman*, No. 7:96-CR-323 (LJL), 2020 WL 4233049 (S.D.N.Y. July 23, 2020) .......................................................................................................................... 10

*United States v. Gomez*, No. 97-CR-696 (SHS), 2021 WL 3617206 (S.D.N.Y. Aug. 16, 2021) 26, 27, 28, 29

*United States v. Ivezaj*, No. 04CR1110 (DLC), 2020 WL 7479413 (S.D.N.Y. Dec. 18, 2020)... 16

*United States v. Jones*, 878 F.3d 10 (2d Cir. 2017) ......................................................... 24

*United States v. Lewis*, No. 10 Cr. 622, 2020 WL 2797519 (E.D.N.Y. May 22, 2020).............. 18

*United States v. Lin*, No. 09-CR-746 (SHS), 2021 WL 2930987 (S.D.N.Y. July 12, 2021).. 13, 16

*United States v. Masotto*, 73 F.3d 1233 (2d Cir. 1996) .................................................... 28

*United States v. McNair*, 481 F. Supp. 3d 362 (D.N.J. 2020) ........................................ 11

*United States v. Peterkin*, No. 05-CR-538-02 (JSR), 2021 WL 1948513 (S.D.N.Y. May 13, 2021) ................................................................................................................................ 13

*United States v. Quinones*, No. 00 CR. 761-1 (JSR), 2021 WL 797835 (S.D.N.Y. Feb. 27, 2021) ............................................................................................................... 14

*United States v. Rodriguez*, 492 F. Supp. 3d 306 (S.D.N.Y. 2020)............................................ 14

*United States v. Rodriguez*, 925 F.2d 1049 (7th Cir. 1991)....................................................... 22

*United States v. Rodriguez*, No. 94-Cr-313 (CSH), 2020 WL 1878112 (S.D.N.Y. Apr. 15, 2020) ............................................................................................................... 27

*United States v. Saleh*, No. 93CR181, 2020 WL 3839626 (S.D.N.Y. July 8, 2020)................... 13

*United States v. Scott*, 990 F.3d 94 (2d Cir. 2021) ................................................................... 24

*United States v. Torres*, 464 F. Supp. 3d 651 (S.D.N.Y. 2020)................................................ 10

*United States v. White*, 165 F.3d 16 (2d Cir. Nov. 13, 1998) ..................................................... 6

*Welch v. United States*, 136 S. Ct. 1257 (2016)........................................................................ 17

*White v. United States*, No. 99 CIV. 11809 (SHS), 2000 WL 546426 (S.D.N.Y. May 4, 2000) .. 7, 29, 34

*Williams v. United States*, 794 F. App'x 612 (9th Cir. 2019)...................................................... 19

**Statutes**

18 U.S.C. § 924............................................................................................................... *passim*

18 U.S.C. § 2114............................................................................................................. *passim*

18 U.S.C. § 3582............................................................................................................. *passim*

28 U.S.C. § 2244............................................................................................................. 17

28 U.S.C. § 2255............................................................................................................. *passim*

28 U.S.C. § 994............................................................................................................... 13

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the defendant Alfred White's *pro se* motions for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A)(i) (ECF Nos. 105, 106) and to vacate, set aside or correct his sentence under 18 U.S.C. § 2255 (ECF Nos. 97, 100), as supplemented by defense counsel on September 9, 2021 (ECF No. 123) (the "Motion").

The defendant is a former U.S. Postal Service employee who masterminded three gunpoint robberies of his own fellow employees in December 1991, October 1992, and January 1993, and the execution-style killing of one employee, Guillermo Gonzalez, during the final robbery.  The evidence at trial showed that the defendant plotted the final robbery over the course of months, recruiting others to carry out the robbery and the murder.  As the inside man responsible for masterminding the crimes, the defendant went so far as to personally elicit detailed information from the victim himself in advance of the murder.  To ward off suspicion of his own involvement, the defendant arranged the victim's killing.

In 1997, a jury convicted the defendant on all 10 of the counts on which he was indicted. The defendant was sentenced to a term of life imprisonment, plus a total mandatory consecutive term of 25 years on two of the counts.

The defendant—who concedes that he grew up in a law-abiding, two-parent, middle-class family—argues that he is a changed man, and that his rehabilitation and the risks posed by COVID-19 are extraordinary and compelling circumstances warranting his early release.  He also argues that aggravated postal robbery is not a crime of violence and therefore not a valid Section 924(c) predicate, and that the Court's *Pinkerton* jury charge makes it impossible to know whether the defendant's Section 924(c) convictions rest on substantive robberies.  Lastly, rehashing a perjury theory that this Court has already rejected, the defendant argues he is entitled to an evidentiary

1

hearing regarding the government's knowledge about a witness's alleged perjury given "newly discovered evidence" that allegedly undermines the defendant's personal role in planning and directing the final robbery and murder.

The defendant's claims are meritless. For the reasons set forth below, the Court should deny the defendant's requests for a sentence reduction under Section 3582 and for vacatur, resentencing, and an evidentiary hearing under Section 2255.

STATEMENT OF FACTS

### A.  The Indictment

Superseding Indictment S1 96 Cr. 1123 (SHS) (the "Indictment") was filed on February 5, 1997 and charged the defendant in 10 of 11 counts.[1]

Count One charged the defendant with conspiring to murder a U.S. Postal Service employee, in violation of 18 U.S.C. § 1117. Count Two charged the defendant with murder of a United States Postal Service employee, in violation of 18 U.S.C. §§ 1111, 1114 and 2. Counts Three, Six, and Nine charged the defendant with conspiring to commit three separate robberies of mail, money, or property of the United States, in violation of 18 U.S.C. § 371. Counts Four, Seven, and Ten charged the defendant with committing three separate robberies of mail, money, or property of the United States, in violation of 18 U.S.C. §§ 2114 and 2. Counts Eight and Eleven charged the defendant with using and carrying a firearm during and in relation to a crime of violence—specifically, the robberies charged in Counts Seven and Ten—in violation of 18 U.S.C. §§ 924(c)(1), (3) and 2.

---

[1] Count Five charged co-defendant Gregory Cintron with being an accessory after the fact to murder.

**B. The Evidence at Trial**

Trial commenced on October 28, 1997.  The defendant was a postal service employee assigned to the Parkchester Post Office starting in 1990.  The Government's evidence at trial included testimony from several of the defendant's co-conspirators and extensive corroborating phone records showing that over the course of many months, the defendant used his position inside the post office to drive the planning of three armed robberies and the murder of his fellow postal service employee.

Prior to working at the Parkchester Post Office, the defendant began working at the Bronx Depot of Tri-State Newspaper Delivery, where he befriended George Gallego and Fernando Alvarez, both of whom testified to their involvement in a credit card fraud scheme with the defendant.  Trial Tr. 269-71, 638-44, 691-94.  Both George Gallego and Alvarez testified that, while employed by both Tri-State and the Parkchester Post Office, the defendant began attempting to recruit people to participate in robbing the Parkchester Post Office, and that those people in turn recruited others.  Trial Tr. 273-85, 686-98.  As a postal employee, the defendant was able to learn and share with co-conspirators detailed information about a particular postal truck, driven by an unarmed postal worker, that collected all the money received from the post offices each day, ending with the Parkchester Post Office, and transported the money to the Bronx General Post Office for safekeeping overnight.  Trial Tr. 51, 56, 153-66, 692-93.

December 1991 Robbery.  George Gallego testified that for the first robbery, the defendant tried and failed to recruit George Gallego.  Trial Tr. 693.  The defendant then recruited Alvarez, who testified at trial about the details the defendant shared with him regarding operations at the Parkchester Post Office, and how Alvarez in turn recruited an associate. Trial Tr. 229-43. Alvarez's testimony further established that on December 4, 1991, based on information and

instructions provided by the defendant, Alvarez's associate and others went to Parkchester Post Office and robbed a postal service truck driver, Lawrence Wilburn, and another employee, Ignacio Ortega, at gunpoint as the employees were about to load money onto the truck, totaling $88,000 according to postal service records.  Trial Tr. 88, 242-45.  The associate gave about $14,000 to Alvarez, who in turn gave half to the defendant, and the defendant was upset by the small size of his share.  Trial Tr. 245-49.

October 1992 Robbery.  George Gallego testified that the defendant then re-approached him and proposed another robbery based on the success of the first.  Trial Tr. 695-96.  George Gallego testified that over months, the defendant and George Gallego had elaborate discussions about how to commit the robbery, with the defendant using a concealed video camera to record the inside of the Parkchester Post Office and providing the video, and information about the station's activities, to George Gallego.  Trial Tr. 711-14.  The Government presented extensive phone records corroborating numerous calls and beeper pages between the defendant and George Gallego during this period, up to and including the night of the robbery.  Trial Tr. 1187-91.  George Gallego, in turn, recruited associates to assist in the robbery, including James Kelly.  Both George Gallego and Kelly testified to reviewing the defendant's video, scouting the Parkchester Post Office area, and becoming familiar with the truck route with the defendant's assistance.  Trial Tr. 364-72, 708-09.  George Gallego testified that the defendant provided postal service uniforms and chose October 2, 1992 as the date the robbery should occur, and further testimony from the supervisor of the Parkchester Post Office established that the defendant requested leave from work that day.  Trial Tr. 493, 725-26.

George Gallego and Kelly testified that the defendant waited in his car in the parking lot of Parkchester Post Office, with George Gallego's children, and communicated instructions to

George Gallego by phone and walkie-talkie as the robbery took place.  Trial Tr. 372-76, 386-87, 730-34.  Kelly further testified that George Gallego got off the phone with the defendant and then, with Kelly and another associate, walked up to the loading dock dressed in the uniforms procured by the defendant and used a shotgun to approach the Postal Service truck driver and an employee who had been a victim in the first robbery.  Trial Tr. 378-84, 475-76.  George Gallego and Kelly testified that Kelly urged George Gallego to retreat, and that the robbery was unsuccessful, Tr. 382-83, 738-39, and George Gallego testified that he and the defendant communicated right afterwards, with the defendant urging him to recover the money from the dock.  Trial Tr. 738-39.

January 1993 Robbery and Murder of Guillermo Gonzalez.  After the failed robbery, a new Postal Service driver, 24-year-old Guillermo Gonzalez, was assigned to the money-collection route, which required the defendant to collect new information regarding Gonzalez's route and timing for picking up the money from the last stop, Parkchester Post Office.  Trial Tr. 746-47.  George Gallego testified that the defendant decided that the best way to obtain this information was to ask Gonzalez directly.  Trial Tr. 746-47.  After doing so, the defendant realized that killing Gonzalez was the only way to commit the robbery without attracting suspicion.  Trial Tr. 750-51.

Kelly declined to participate in another robbery, and George Gallego recruited his brother Alfredo Gallego, and an associate from the previous robbery recruited Giovanni Rosado.  Trial Tr. 741, 1012.  George Gallego testified that he and the defendant drove in separate cars behind the victim's truck on January 21, 1993, and he and Rosado testified that Rosado used his car to cut off Gonzalez's truck, which allowed Alfredo Gallego to approach the truck.  Trial Tr. 799-800, 10334-35.  Forensic evidence established that Alfredo Gonzalez then used George Gallego's handgun, with a homemade silencer attached, to shoot Gonzalez in the forehead.  Trial Tr. 621-25.  Alfredo Gonzalez then began driving the truck.  Trial Tr. 622, 749, 1036, 1368.  George Gallego testified

that he and the defendant initially followed in separate cars, and that the defendant broke off in his car and went to the Bronx depot where he expected to meet George Gallego and receive his share of the money.  Trial Tr. at 766, 799-800.  George Gallego and Rosado testified Alfredo Gallego continued driving, leading the truck to a residential street in New Jersey, where the truck hit a fire hydrant and attracted attention.  Trial Tr. 618, 805, 1037, 1040-41.  The robbers fled, but a detective responding to the 911 call caught Alfredo Gallego and recovered a postal sweater provided to George Gallego by the defendant.  Trial Tr. 611-13, 950.  Again, the Government presented phone records that corroborated George Gallego's testimony regarding his communications with the defendant leading up to, during, and after the murder, including calls made just after the murder from the Bronx depot to George Gallego, followed by additional calls from the defendant's home residence to George Gallego.  Trial Tr. 1192-95, 1529-33.

### C.  The Verdict and Sentence

On November 13, 1997, the jury returned a verdict finding the defendant guilty on all ten counts charged against him in the Superseding Indictment.  On March 13, 1998, this Court sentenced the defendant to term of life imprisonment, plus a five-year mandatory consecutive term on Count 8 and 20-year mandatory term on Count 11; and a term of supervised release of five years concurrent on Counts One, Two, Four, Seven and Ten, and three years concurrent on Counts Three, Six, Eight, Nine and Eleven.  This Court imposed restitution in the amount of $81,000.

### D.  The Defendant's Appeal and Section 2255 First Petition

On March 13, 1998, the defendant filed a notice of appeal.  His appeal raised two arguments: (i) the Court committed reversible error by admitting evidence that the defendant had previously engaged in credit card fraud with three of his co-conspirators in the robberies; and (ii) that the Court erred in not providing a *sua sponte* charge on the credibility of accomplice witnesses.

The Second Circuit rejected these arguments and affirmed the defendant's conviction on appeal. *United States v. White*, 165 F.3d 16 (2d Cir. Nov. 13, 1998) (summary order).

On December 6, 1999, the defendant sought vacatur of the Court's judgment under Section 2255 arguing ineffective assistance of trial counsel based on trial counsel's alleged failure to raise, among other things, some of the theories he now raises in the instant Motion. On May 4, 2000, this Court denied the petition in a detailed opinion. *White v. United States*, No. 99 CIV. 11809 (SHS), 2000 WL 546426, at *3 (S.D.N.Y. May 4, 2000). Relevant here, the Court rejected the defendant's allegation that the government introduced perjured testimony from co-defendant George Gallego as to the date of the lock change at the Bronx depot and the exchange of keys between the defendant and Gallego. The Court determined that resolution of the alleged inconsistencies between the testimony given by Gallego, the testimony of other witnesses, and the affidavits accompanying his Section 2255 petition "was a matter of credibility well within the ken of the jury and they simply provide no basis for concluding that Gallego's testimony was perjured." *Id.* at *3. The Court further found, "Even assuming for the sake of argument that Gallego did commit perjury, these inconsistencies fail to demonstrate that the government knew or should have known of the alleged perjury, and the independent evidence of White's guilt was substantial. *Id.* at *4.

### E.  The Instant Motion

On June 24, 2016, White submitted a second *pro se* petition to vacate his judgment under Section 2255 in light of *Johnson v. United States*, 576 U.S. 591 (2015), in which the Supreme Court struck as unconstitutionally vague the residual clause definition of a predicate "violent felony" under the Armed Career Criminal Act (ECF No. 97). The defendant argued that the predicate "crime of violence" that appears in 18 U.S.C. § 924(c)(3)(B) must also be struck, and

that neither postal service robbery nor conspiracy to commit the same remained valid predicate "crimes of violence" sufficient to sustain his two Section 924(c) convictions.  On June 26, 2020, the defendant filed another Section 2255 *pro se* petition in light of *United States v. Davis*, 139 S. Ct. 2319 (2019), where the Supreme Court extended *Johnson* to strike the definition of a "crime of violence" under § 924(c)(3)(B) as unconstitutionally vague.

The Second Circuit authorized the defendant to pursue his successive claims and to amend his petitions, noting that the district court had the task of determining whether the defendant had satisfied the threshold requirements governing Section 2255 motions and finding only that a prima facie showing has been made as to one of those claims—the defendant's assertion that the aggravated form of Section 2114(a) postal robbery is not a valid predicate for his Section 924(c) convictions.  ECF Nos. 102, 104.  The defendant then also filed a *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  ECF Nos. 105, 106.  On June 11, 2021, the Court appointed the Federal Defenders of New York to represent the defendant on his various applications, and defense counsel supplemented the defendant's Section 3582 and Section 2255 claims on September 3, 2021.

As to his Section 3582 claims, the defendant now asserts what he styles as four extraordinary and compelling reasons for a sentence reduction: (i) his "stellar prison record," Mot. 30, (ii) his "positive impact on others," Mot. 31-32, (iii) the "extraordinary danger of COVID-19, notwithstanding his vaccinations, Mot. 33-36, and (iv) the lack of danger he poses, Mot. 36.

As to his Section 2255 claims, the defendant raises two principal arguments for vacating the judgment: (i) aggravated postal robbery is not a valid crime of violence predicate after *Davis*, Mot. 40-46, and (ii) that leaves no valid Section 924(c) predicate because the jury could have found

the defendant guilty of substantive crimes based on the *Pinkerton* theory in the Court's jury instructions, which is also invalid after *Davis*.  Mot. 46-60.

The defendant separately argues that he is entitled to an evidentiary hearing "to determine the extent to which the government was aware that one of its key witnesses against White, George Gallego, lied about key aspects of the case" based on four alleged pieces of "newly discovered evidence" of the alleged perjury.  Mot. 60.  The defendant's "newly discovered evidence" consists of: (i) two sentences from the co-conspirator who shot the victim, Alfredo Gallego, in emails dated 2016 and 2018, in which the shooter claims that he "do[esn]'t remember" if the killing was ordered by the defendant and that "[a]s far as [Alfredo Gallego] knew," the killing was George Gallego's plan, (ii) Alfredo Gallego's statement, in the 2018 email, that George Gallego initially built silencers to sell, not specifically to kill the victim at the defendant's behest, (iii) Alfredo Gallego's statement, in response to a questionnaire to assist in the defendant's innocence claims, that he was "aware of" only a post-robbery meeting at Hunts Point rather than the Bronx Depot, and (iv) a police report that shows the Bronx Depot suffered a break-in sometime after the murder, allegedly undermining George Gallego's testimony about a break-in before the murder and lock change requiring the defendant to provide keys to George Gallego for the post-robbery meeting.

## ARGUMENT

The defendant is not entitled to relief under either Section 3582 or Section 2255.

First, the defendant, who is fully vaccinated, cannot show that the risks posed by COVID-19 warrant a sentence reduction in his case, and as a matter of law, the defendant's alleged rehabilitation cannot by itself be deemed an extraordinary and compelling reason for such a reduction.  Second, the Supreme Court's decision in *Davis* does not affect the valid predicates underlying the defendant's Section 924(c) convictions, and thus his corresponding Section 2255 claims do not satisfy the threshold requirements for filing a Section 2255 petition.  Specifically,

(i) the aggravated form of postal robbery under Section 2114(a) is divisible and the particular form with which the defendant was convicted is a crime of violence, and (ii) *Pinkerton* instructions do not transform substantive robbery convictions into invalid Section 924(c) predicates. Third, the arguments reasserted by the defendant based on alleged "newly discovered evidence," regarding George Gallego's allegedly perjured testimony, were already rejected by this Court and would not entitle the defendant to relief even if proved, hence no evidentiary hearing should be granted.

## I. The Defendant Is Not Entitled to a Sentence Reduction under Section 3582.

### A. COVID-19 is not an extraordinary and compelling reason to release the fully vaccinated defendant.

Notwithstanding the COVID-19 pandemic, the defendant's health and personal characteristics do not qualify as extraordinary and compelling reasons justifying his early release.[2] Although the defendant cites his hypertension and obesity as medical conditions that heighten his risk of contracting or suffering severe manifestations of COVID-19, he concedes, and his medical records confirm,[3] that he is fully vaccinated.[4] Mot. at 36. According to the Centers for Disease

---

[2] The Court should not reach whether COVID-19 is an extraordinary and compelling reason for a sentence reduction because the defendant did not specifically raise COVID-19, or his health conditions, in his petition to the BOP and therefore did not fully exhaust those arguments. ECF No. 106, at 53. The Government recognizes that this Court has previously held that "issue exhaustion" is not required before a district court may consider a compassionate release motion. *United States v. Torres*, 464 F. Supp. 3d 651, 655 (S.D.N.Y. 2020). But other courts in this District have ruled that the initial claim for early release filed with the BOP must be "reasonably related" to the subsequent claim submitted to the court. *See, e.g.*, *United States v. Gluzman*, No. 7:96-CR-323 (LJL), 2020 WL 4233049, at *13 (S.D.N.Y. July 23, 2020). To permit the defendant to "'bypass' section 3582(c)(1)(A)'s exhaustion requirement 'by presenting one reason for relief to the BOP and another to the Court' would 'create an end-run around the exhaustion requirement and deprive the BOP of the opportunity to consider [the defendant's] request.'" *United States v. Collado*, No. 14-CR-731-LTS, 2021 WL 2555838, at *3 (S.D.N.Y. June 21, 2021) (quoting *United States v. McNair*, 481 F. Supp. 3d 362, 368 (D.N.J. 2020)).

[3] The defendant's medical records are being filed under seal as Exhibit A.

[4] Earlier this month, the CDC recommended that people aged 65 years and older who have received Pfizer-BioNTech's Covid-19 vaccine receive a booster shot at least six months after completing

Control and Prevention ("CDC"), all vaccines authorized for use in the United States "have been shown to be efficacious and effective against SARS-CoV-2 infections, including asymptomatic infection, symptomatic disease, severe disease, and death."[5]  More specifically, the defendant's Bureau of Prisons ("BOP") records indicate that on April 13, 2021, the defendant received his second dose of the Pfizer-BioNTech vaccine, which studies to date show is 100 percent effective against severe COVID-19 as defined by the U.S. Food and Drug Administration.  Ex. A at 129.[6] Where medical records show that the defendant's health condition is stable, underlying health conditions do not qualify as an extraordinary and compelling circumstance.  *United States v. Figueroa*, No. 15CR711 (DLC), 2021 WL 3727091, at *1 (S.D.N.Y. Aug. 20, 2021); *United States v. Arinze Obika*, No. 20CR179 (DLC), 2021 WL 4326750, at *1 (S.D.N.Y. Sept. 22, 2021).

In addition, the BOP and FCI Fairton, the medium-security facility where the defendant is housed, have undertaken significant efforts to control the spread of COVID-19 in the facility.  As of the date of this filing, no inmates at FCI Fairton are currently positive with the virus, and the defendant is among the 877 inmates and 160 staff members who have been administered the vaccine.[7]  *See United States v. Batista*, No. 18-CR-319-LTS, 2020 WL 6132239, at *4 (S.D.N.Y. Oct. 19, 2020) (recognizing substantial past COVID-19 infections at facility, but taking into

---

the two-dose primary series.  The defendant was vaccinated on April 13, 2021, and therefore does not require (or qualify for) a booster shot.

[5] Centers for Disease Control and Prevention, *Science Brief: Background Rationale and Evidence for Public Health Recommendations for Fully Vaccinated People*, March 8, 2021, https://www.cdc.gov/coronavirus/2019-ncov/more/fully-vaccinated-people.html (last visited Oct. 6, 2021).

[6] Pfizer Press Release, Apr. 1, 2021, https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-confirm-high-efficacy-and-no-serious (last visited Oct. 6, 2021).

[7] Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus (last visited October 6, 2021).

account the facility's more recent success in controlling the spread of the virus in concluding that extraordinary and compelling reasons do not warrant a sentence reduction).

Under these circumstances, the defendant cannot meet his burden to show that the risk that he will suffer a severe outcome from COVID-19 infection is sufficiently extraordinary and compelling to justify his early release.

### B. The defendant's alleged rehabilitation is not an extraordinary and compelling reason for a sentence reduction.

The defendant argues that his early release is warranted in light of his rehabilitation, as demonstrated by his "stellar prison record" and "positive impact on others." Mot. at 30, 31. While rehabilitative efforts are commendable, "every inmate should strive for a productive institutional record while incarcerated because that is what is expected." *United States v. Saleh*, No. 93CR181, 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020) (denying early release based on purported rehabilitation). In addition, the defendant fails to acknowledge that, as this Court has made clear elsewhere, "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason" for a sentence reduction. *United States v. Lin*, No. 09-CR-746 (SHS), 2021 WL 2930987, at *3 (S.D.N.Y. July 12, 2021) (quoting 28 U.S.C. § 994(t) (emphasis added by Court). Because the defendant has failed to present any other valid basis for early release, his rehabilitation argument necessarily fails.

Even if the defendant were able to point to other bases for a sentence reduction, the defendant's evidence of rehabilitation does not entitle him to relief. Most of the defendant's letters come from religious leaders, mental health program leaders, inmates, family and friends. Accordingly, these letters should receive "some, but not a lot, of weight." *United States v. Peterkin*, No. 05-CR-538-02 (JSR), 2021 WL 1948513, at *2 (S.D.N.Y. May 13, 2021) (denying a sentence reduction where the defendant put forth 60 certificates earned in prison, his work as a

pastor, the business that he started in prison, and letters attesting to his rehabilitated character).

The defendant also offers three letters from his "materials handler supervisors," but these attest

primarily to his diligence as an employee, *see*, ECF No. 106, at 91-94, a point not disputed even

at the time of the crimes.  *See* Trial Tr. 531-32 (testimony from former co-worker describing the

defendant as a "[v]ery hard and dedicated worker").  In contrast, in cases in which courts in this

District have recognized rehabilitation as a basis for a sentence reduction, defendants have

presented evidence of "transformation," as supported by, among other things, "multiple letters

from prison officials, some expressly advocating for [the defendant's] release."  *United States v.*

*Quinones*, No. 00 CR. 761-1 (JSR), 2021 WL 797835, at *3 (S.D.N.Y. Feb. 27, 2021)

(underscoring a letter from the retired warden supporting a sentence reduction); *see also United*

*States v. Rodriguez*, 492 F. Supp. 3d 306, 309 (S.D.N.Y. 2020) (describing 27 letters from prison

officials).

   As a matter of law, and on this evidentiary record, the defendant's rehabilitation cannot be

deemed an extraordinary and compelling reason for a sentence reduction.

   **B.     The 18 U.S.C. § 3553(a) factors weigh against sentence reduction.**

   Given the defendant has not established any extraordinary and compelling reasons for a

sentence reduction, this Court need not reach the sentencing factors set forth at 18 U.S.C.

§ 3553(a).  But these factors, which must be considered before a motion may be granted under 18

U.S.C. § 3582(c)(1)(A), also weigh against a sentence reduction.[8]

---

[8] Although the defendant styles the lack of danger he poses as another extraordinary and
compelling reason for his release, Mot. at 36-37, this factor is properly considered as part of the
Section 3553(a) analysis, which requires the Court to consider the need for the sentence imposed
"to protect the public from further crimes of the defendant."  18 U.S.C. 3553(a)(2)(C).  Even
putting aside the defendant's failure to address recidivism rates specific to violent offenders, *see*
Congressional Research Serv., *The Federal Prison Population Buildup: Overview, Policy
Changes, Issues and Options* 48 (March 2013) (reporting "[r]ecidivism rates for violent offenders
were relatively high across age groups," and that "[o]ver one-third (36.4%) of violent offenders

As this Court explained at sentencing, life imprisonment is appropriate "given the extraordinary seriousness of the offense, the tragic consequences of the crime and the need for punishment and deterrence." Sentencing Tr. 9. The defendant grew up in what he concedes was a "good household," with two "law-abiding, church-going, hard-working, middle-class" parents who were committed to him and his sisters. Mot. at 5. At the time of his crimes, he was employed by the federal government and was raising his own family. Mot. at 5. He then orchestrated multiple robberies of his own government coworkers and planned the execution of one young colleague to ensure he would escape detection—and for three years, escape detection he did. Trial Tr. at 1461. Though the defendant repeatedly describes himself as a "first-time offender," ECF No. 106, at 2, 6, who is serving life imprisonment after being "arrested for the first time in his life," ECF No. 123, at 2, he is not in prison for a single crime, an anomalous decision, or a split-second error in judgment.[9] In fact, the evidence at trial established that over the course of more than a year, the

---

released after the age of 50 recidivated—this rate remains more than twice as high as the rate for non-violent offenders released after age 50"), the bottom line is that the danger the defendant poses is only one of a number of factors in the Section 3553(a) analysis, the balance of which weighs against the defendant's release for the reasons described at sentencing.

[9] In a recent decision denying co-conspirator Alfredo Gallego's request for a sentence reduction for his role in the crime, Judge Kaplan observed that though Gallego was "entitled to a good deal of credit for having made constructive use of his time in prison," the nature of the murder and other Section 3553(a) factors weighed against relief. He explained:

> This was a carefully planned, premeditated murder deliberately carried out in the course of an armed robbery. The planning, as the government notes, went on for months. The robbery was attempted a week before Gallego and his confederates succeeded in carrying it out and murdering the postal service driver. This killing thus was not a product of rage. It was not a crime of passion. It was not committed on a sudden impulse. It was a deliberate part of an elaborate scheme that was thought through in advance. There was plenty of time for Gallego to have backed out.

defendant plotted three gunpoint robberies, committed on three separate occasions, in addition to devising and ordering a murder. He is serving time after being convicted by a jury for what he himself describes as an "offense [] of the utmost seriousness." ECF No. 106, at 6.

Elsewhere, in cases not involving premeditated murder, this Court has held that the Section 3553(a) factors require denial of a defendant's request for the reduction of a sentence of life imprisonment because such a sentence reduction "would fail to reflect the seriousness of the offense, provide just punishment, or afford adequate deterrence. *Lin*, 2021 WL 2930987, at *3 (internal quotation marks omitted). Similarly, other courts in this District have denied sentence reductions where the original sentence imposed properly reflected the seriousness of a violent crime and the defendant's "role in perpetuating that violence." *United States v. Ivezaj*, No. 04CR1110 (DLC), 2020 WL 7479413, at *2 (S.D.N.Y. Dec. 18, 2020).

This is just such a case. The defendant was sentenced to life imprisonment in light of his dispositive role in three armed robberies and the murder of Guillermo Gonzalez. The reasons justifying the defendant's sentence remain as compelling today as they were at his sentencing.

## II. __The Defendant Is Not Entitled to Vacatur under Section 2255.__

### A. **The defendant's *Davis* claim fails to satisfy the threshold requirements governing successive Section 2255 motions.**

As the Second Circuit noted in its March 29 order, ECF No. 102, this Court has the preliminary task of determining whether the defendant's Section 2255 claims satisfy the threshold requirements governing successive Section 2255 motions. *Massey v. United States*, 895 F.3d 248, 251 (2d Cir. 2018). The defendant's *Davis* claim fails those requirements.

---

Sentencing Transcript, *United States v. Alfredo Gallego*, No. 95-284, ECF No. 240, at *2 (S.D.N.Y. Aug. 19, 2021). All this is no less true of the defendant, Alfred White, the originator and primary orchestrator of the scheme.

A claim presented for the first time in a second or successive Section 2255 motion "shall be dismissed" unless the defendant shows that the claim relies on: (1) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court;" or (2) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," and "the facts underlying the claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2).  The Government does not dispute that *Davis* announces a new rule of constitutional law made retroactive by the Supreme Court.  *See Welch v. United States*, 136 S. Ct. 1257, 1266 (2016).  But it is not enough to simply invoke a new rule of constitutional law that has been made retroactive; a defendant's claim "relies on" a new rule of constitutional law only if the defendant can "show a reasonable likelihood that he would benefit from the new rule he seeks to invoke."  *In re Henry*, 757 F.3d 1151, 1162 (11th Cir. 2014).  The defendant cannot show any such reasonable likelihood here because, as described below, even after *Davis*, postal robbery under Section 2114(a) remains a crime of violence and valid Section 924(c) predicate, and the Court's *Pinkerton* charge in no way undermines the defendant's convictions for substantive robbery offenses.  This Court should therefore dismiss the defendant's purported *Davis* claims for failure to satisfy Section 2244(b)(2).

**B. Postal robbery under Section 2114(a) remains a valid Section 924(c) predicate after *Davis*.**

1. The defendant's conviction for assaulting a postal worker and "in effecting or attempting to effect such robbery . . .  put[ting] his life in jeopardy by the use of a dangerous weapon" is a valid Section 924(c) predicate.

The Superseding Indictment and jury instructions make plain that the defendant was convicted of the portion of Section 2114(a) that criminalizes "assault[] . . . with intent to rob" and

"in effecting or attempting to effect such robbery . . . put[ting] [a postal employee's] life in jeopardy by the use of a dangerous weapon."  Every Circuit to address the issue, and every district judge to address the issue in this Circuit,[10] has held that a conviction under this portion of the statute—sometimes colloquially described as "aggravated postal robbery" using a dangerous weapon—is a conviction for an offense capable of causing physical pain or injury to another person that therefore qualifies as a crime of violence and valid Section 924(c) predicate.

For example, the Fourth Circuit has recognized that "assault" under Section 2114(a) is not statutorily defined but that common-law definitions uniformly relied upon by the courts make clear that "assault requires at least some use or threatened use of force."  *United States v. Bryant*, 949 F.3d 168, 180–81 (4th Cir. 2020) (citing *Knight v. United States*, 936 F.3d 495, 500 (6th Cir. 2019)).  Thus, "use of a dangerous weapon to put the victim's life in jeopardy transforms" whatever force that could be used in an assault and robbery "into violent physical force."  *Id.* (quoting *Knight*, 936 F.3d at 500-01); *see also Williams v. United States*, 794 F. App'x 612, 614 (9th Cir. 2019); *United States v. Enoch*, 865 F.3d 575, 582 (7th Cir. 2017); *In re Watt*, 829 F.3d 1287, 1290 (11th Cir. 2016).

The defendant's Section 924(c) convictions are validly predicated on armed postal robbery. This remains a crime of violence under *Davis*, and the defendant's inability to cite a single ruling to support his argument to the contrary speaks to the argument's plain lack of merit.

---

[10] *See Pannell v. United States*, No. 06-CR-578 (NG), 2021 WL 3782729, at *4 (E.D.N.Y. Aug. 26, 2021) ("[T]here can be no doubt that armed postal robbery under § 2114(a) qualifies as a predicate crime of violence under § 924(c)"); *United States v. Lewis*, No. 10 Cr. 622, 2020 WL 2797519, at *9-10 (E.D.N.Y. May 22, 2020); *McCullough v. United States*, No. 14 Civ. 1920, 2020 WL 869118, at *3-4 (E.D.N.Y. Feb. 21, 2020); *Moody v. United States*, No. 07 Cr. 139, 2020 WL 529281, at *8 (W.D.N.Y. Feb. 3, 2020).

2. <u>Aggravated postal robbery is a further divisible offense and the particular offense for which the defendant was convicted is a valid Section 924(c) predicate.</u>

The defendant attempts to undermine the above analysis by arguing that all these courts have overlooked the fact that aggravated postal robbery is a "single, unitary offense" for which the courts may look only to the statute, rather than the underlying indictment or other documents, to determine whether the defendant was necessarily convicted of a crime of violence.  To reach this conclusion, the defendant disregards the "elements or means" test established in *Mathis v. United States*, 136 S. Ct. 2243 (2016), to assess whether a statute is divisible and instead presents his own unpersuasive reasons for why aggravated postal robbery is an indivisible offense.

As the defendant acknowledges, Section 2114(a) is, *at minimum*, divisible into two offenses, which he terms "simple postal robbery" and "aggravated postal robbery."  Mot. at 41.  A person is subject to a ten-year maximum for "simple postal robbery" if he "assaults any person having lawful charge, control, or custody of any mail matter or of any money or other property of the United States, with intent to rob . . . ."  18 U.S.C. § 2114(a).  A person is subject to a 25-year maximum for what is often referred to as "aggravated postal robbery" if in committing that robbery, he "wounds the person having custody of such mail, money, or other property of the United States, or puts his life in jeopardy by the use of a dangerous weapon, or for a subsequent offense." *Id.*

The question is whether the second half of Section 2114(a), the portion imposing the 25-year maximum, is *further* divisible.  The parties agree that if the second half of Section 2114(a) is *not* further divisible, and merely lists alternative "means" of committing a single crime, then the courts must employ the "categorical approach" and look only to the statutory language to determine whether the defendant necessarily committed a crime of violence.  *Speed v. United States*, No. 04 CR 336 (PKC), 2020 WL 6290385, at *3 (S.D.N.Y. Oct. 27, 2020) (quoting *Mathis*,

18

136 S. Ct. at 2249).  But if the second half of Section 2114(a) is divisible and lists alternative "elements" defining multiple aggravated postal robbery crimes, the courts may employ the "modified categorical approach," whereby they "look[ ] to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy)" to determine whether the defendant was convicted of committing a crime of violence.  *Id.*

The defendant argues the second half of Section 2114(a) is indivisible and the Court cannot peek at the jury instructions or indictment to determine which of the three alleged means of committing aggravated postal robbery applies in the defendant's case because wounding a postal worker, putting a postal worker's life in jeopardy using a dangerous weapon, and committing a subsequent simple postal robbery amount to three *means* of committing the same crime.  Mot. at 42 & n.8.  Further, in the defendant's view, at most only two of these "means" requires violence, in the form of either wounding a postal worker or, as in this case, using a dangerous weapon to jeopardize their life.[11]  Mot. at 41.  The third "means" consists of merely committing "simple postal robbery" a second time, which the defendant concludes does not qualify as a crime of violence because "a simple assault . . . does not require conduct capable of causing physical pain

---

[11] The defendant argues, in the alternative, that the portion of the statute for which the defendant was convicted—putting one's "life in jeopardy by the use of a dangerous weapon"—also does not categorically require the use of violent force.  Relying on *United States v. Rodriguez*, 925 F.2d 1049 (7th Cir. 1991), like the defendants in *Knight* and *Enoch*, the defendant argues that even a concealed gun satisfies the element of use of a gun in Section 2114(a), and therefore the statute does not require physical force.  The Sixth and Seventh Circuits squarely rejected this argument. *Knight*, 936 F.3d at 501; *Enoch*, 865 F.3d at 582.  As the Sixth Circuit explained, in *Rodriguez*, the defendant carried the gun in his pocket but took it out and threatened the letter carrier after the robbery, and the Court concluded that the ready availability of the gun put the letter carrier's life in jeopardy.  *Knight*, 936 F.3d at 501.  "[T]he statutory requirement that in effecting the crime, the victim's life is put in jeopardy by use of the gun . . . combined with the threat of general force required by both assault and robbery, amounts to the use of violent physical force."  *Id.*

or injury." Mot. at 44.  On this reasoning, aggravated postal robbery is indivisible and committing it by *any* of the three listed "means" can *never* constitute a crime of violence.  Mot. at 45.

The defendant's analysis is incorrect under the requisite "elements or means" analysis set forth by the Supreme Court in *Mathis*.  There the Supreme Court defined an "element" as "what the jury must find beyond a reasonable doubt to convict the defendant" and "means" as those facts that "need not be proven beyond a reasonable doubt, and need not be specified within the charging instrument." *United States v. George*, 223 F. Supp. 3d 159, 164 (S.D.N.Y. 2016) (quoting *Mathis*, 136 S.Ct. at 2250).  "Means" need not be proven beyond a reasonable doubt because they merely "spell[] out various factual ways of committing some component of the offense" and constitute "illustrative examples." *Mathis*, 136 S. Ct. at 2250, 2256.

In plain English, "elements" elucidate *what* the defendant did, while "means" elucidate *how* the defendant did it.  By way of example, the *Mathis* Court observed that a statute that requires use of a "knife, gun, bat, or similar weapon" should be understood to "merely specif[y] diverse means of satisfying a single element of a single crime," such that "a jury need not find (or a defendant admit) any particular item." *Id.* at 2249.  In clear contrast, wounding a postal worker, putting a postal worker's life in jeopardy using a dangerous weapon, and committing a second simple postal robbery cannot be reduced to *ejusdem generis* (of the same kind or class) statutory requirements like "knife, gun, bat or similar weapon," or be deemed "various factual means" of committing what amounts to the same crime, such that the jury need not specify which accurately describes the defendant's conduct.  Indeed, it is inconceivable that a charging document or jury would fail to specify whether the defendant is being charged or convicted, respectively, for wounding a postal worker or jeopardizing a postal worker's life with a dangerous weapon, on the

one hand, or committing a second postal robbery, on the other hand.[12]  The three disjunctive parts of Section 2114(a) set out the elements of three offenses, not different means for committing the same offense.

Eliminating any doubt as to the correctness of this analysis, in language and structure the second half of Section 2114(a) closely resembles the New York state statute for first-degree robbery, which the Second Circuit already held criminalizes "multiple acts in the alternative" and is therefore divisible.  *United States v. Jones*, 878 F.3d 10, 16 (2d Cir. 2017).  The Second Circuit reasoned that "[t]here are four categories of first-degree robbery, depending on whether: the perpetrator "(1) [c]auses serious physical injury to any person who is not a participant in the crime; or (2) [i]s armed with a deadly weapon; or (3) [u]ses or threatens the immediate use of a dangerous instrument; or (4) [d]isplays what appears to be a . . . firearm." *Id.* at 16.  This holding is consistent with the Second Circuit's treatment of other, structurally similar New York state statutes separating multiple, substantively distinct elements by the conjunctive "or."  *See, e.g.*, *United*

---

[12] Rather than addressing the substantive differences between these three disjunctive elements, the defendant disagrees with the penological reasoning of one district court that held, correctly, that the statute outlines three different aggravated postal robbery offenses.  Mot. at 43 n.9.  That court explained:

> [E]ach portion of the enhanced penalty provision is singled out for a different reason: The wounding portion reflects a congressional judgment that greater punishment is appropriate where a government official has been seriously hurt; the life-in-jeopardy provision, where a dangerous weapon is used in such a way as to seriously threaten the official; and the subsequent-offense portion, where a defendant who has previously been convicted of violating § 2114(a) reoffends and so requires a greater sentence to achieve deterrence and incapacitation.

*McDuffie v. United States*, No. 1:16-CV-775 (LMB), 2019 WL 3949303, at *5 (E.D. Va. Aug. 21, 2019), *aff'd in part, appeal dismissed in part*, 806 F. App'x 202 (4th Cir. 2020).  But in focusing on the penological distinctions between the three types of aggravated postal robbery offenses, the court likely intended to underscore that these offenses are fundamentally different in kind.

*States v. Scott*, 990 F.3d 94, 98-99 n.1 (2d Cir. 2021) (en banc) (New York first-degree manslaughter statute is divisible); *Flores v. Holder*, 779 F.3d 159, 166 (2d Cir. 2015) (New York first-degree sexual abuse statute is divisible).

Because aggravated postal robbery is further divisible into separate offenses, under the modified categorical approach, the Court may look at the indictment and charging instructions to ascertain the particular offense with which the defendant was convicted—putting a postal worker's life in jeopardy using a dangerous weapon. *See Flores v. Holder*, 779 F.3d 159, 166 (2d Cir. 2015). This is a crime of violence, for all the reasons described by every Circuit to address the issue, as explained above.

On a final note, the defendant's arguments for why the three alternative elements of aggravated postal robbery that trigger the 25-year maximum are merely three different "means" of committing the same offense are not simply untethered to the *Mathis* analysis but unpersuasive on their own terms.  Mot. at 41.  The defendant contends: (i) "Section 2114(a) is divided in two by a semicolon," (ii) "just as the first half of § 2114(a) is united by a common statutory penalty of 10 years, the second half is united by a common statutory penalty of 25 years," and (iii) "courts seem to universally regard the first half, ordinary postal robbery, as a single offense that can be committed through multiple means.  Accordingly, the second half of § 2114(a) ("aggravated" postal robbery) is likewise a single offense that can be committed through multiple means."

First, the semicolon in Section 2114(a) might be said to separate simple and aggravated postal robbery into *at least* two offenses but does not speak to whether aggravated postal robbery can be further subdivided.  *See United States v. Bryant*, 949 F.3d 168, 174 (4th Cir. 2020) ("[T]he parties agree that § 2114(a) is divisible into *at least* two parts[.]" (emphasis added)).  Second, although it is true that "[i]f statutory alternatives carry different punishments, then . . . they must

22

be elements," *Mathis*, 136 S. Ct. at 2256, it does not follow that statutory alternatives that carry the *same* punishments must be *means*.  There is no reason three aggravated postal robbery offenses cannot each come with a 25-year maximum.  Third, contrary to the defendant's unsupported assertion, the fact that the courts universally regard simple postal robbery as defined in the first half of the statute as a single offense that can be committed through multiple means (e.g., "rob, steal or purloin"; "mail matter, money, or other property") has no bearing whatsoever on whether the structurally and substantively different second half of the statute, regarding aggravated forms of postal robbery, is likewise a single offense that can be committed through multiple means.

The second half of Section 2114(a) is divisible into distinct aggravated postal robbery offenses, and the offense with which the defendant was convicted is without question a crime of violence and valid Section 924(c) predicate.

### C. This Court's *Pinkerton* charge does not affect the validity of the defendant's Section 924(c) convictions.

The defendant contends that by providing a conspiratorial *Pinkerton* charge for each of the eleven counts with which the defendant was charged, the Court created a "significant possibility" that the defendant's Section 924(c) convictions were premised on either of two predicates that are, after *Davis*, invalid crime-of-violence predicates: conspiracy to commit postal robbery or conspiratorial *Pinkerton* liability.  Mot. at 47.  This line of reasoning was rejected by this Court in *United States v. Gomez*, No. 97-CR-696 (SHS), 2021 WL 3617206 (S.D.N.Y. Aug. 16, 2021), and should be rejected here.

In *Gomez*, the defendant's Section 924(c) conviction was predicated on both conspiracy to murder and substantive murder.  The Government did not dispute that *Davis* invalidated conspiracy to commit murder as a valid predicate but, given the two charges were based on the same events, argued that the Section 924(c) conviction should be nonetheless sustained because it

"undoubtedly" rested on the valid predicate of substantive murder.  *Id.* at *3.  This Court agreed, notwithstanding the defendant's contention in *Gomez*, as here, that *Davis* invalidated Section 924(c) convictions based on *Pinkerton* conspiracy liability, and that the Court's *Pinkerton* charge made it impossible to know whether the jury had relied on that invalid theory in finding the defendant liable for the substantive counts with which he was charged.  *Id.*

This Court was not persuaded by the argument, or by the defendant's reliance on the "minority view" that the defendant also principally relies on here, set forth in Judge Haight's opinion in *United States v. Rodriguez*, No. 94-Cr-313 (CSH), 2020 WL 1878112, at *17 (S.D.N.Y. Apr. 15, 2020).  The Court instead agreed with the "majority view" in this District and held that "a jury instruction on *Pinkerton* liability does not affect the validity of a section 924(c) predicate." *Gomez*, 2021 WL 3617206, at *5.  A *Pinkerton* charge permits, but does not require, the jury to hold a defendant "responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes."  *Id.* at *4 (quoting *United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996)).  The court reasoned that "[a] *Pinkerton* charge, like an aiding and abetting charge, provides only an alternative theory of substantive liability."  *Id.*  In addition, this Court explained that "evaluating the validity of a section 924(c) predicate in light of the specific theories of liability relied upon in a given case is fundamentally at odds with the mandates of the categorical approach," given the point of the categorical approach is to identify the minimum criminal conduct necessary for conviction under a statute.  *Id.*  In deploying the categorical approach, the courts look only at the elements of the offense, not the underlying facts; thus, "if a felony is a crime of violence under the categorical approach, substantive conviction of that categorical crime of violence involving a firearm is a valid

predicate for a section 924(c) conviction, regardless of what theory of liability it proceeds on." *Id.* (cleaned up) (quoting *Sessa v. United States*, No. 92-Cr-351 (ARR), 2020 WL 3451657, at *5 (E.D.N.Y. June 24, 2020)).

The defendant's arguments are indistinguishable from those unsuccessfully asserted in *Gomez* and fail here for the same reasons. The Court's *Pinkerton* charge creates no basis for vacating the defendant's Section 924(c) convictions, which rest on valid predicates of *substantive* postal robbery.[13]

## III. The Defendant Is Not Entitled to an Evidentiary Hearing to Relitigate Whether the Government Knew of George Gallego's Alleged Perjury.

Twenty years ago, in addressing the defendant's Section 2255 claims, this Court concluded that even if George Gallego did commit perjury, the defendant had presented no support for the Government's alleged knowledge of that perjury, plus "the independent evidence of [the defendant's] guilt was substantial." *White*, 2000 WL 546426, at *3. The defendant now nonetheless argues that he is entitled to a hearing on the issue. To warrant a hearing, the defendant "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief." *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). The defendant does not satisfy this requirement because his "newly discovered evidence" is, for the most part, not "competent evidence," and, as explained below in the specific context of perjury allegations, does not raise "issues of fact that . . . would entitle him to relief."

---

[13] The jury's conviction of the defendant on all the charged substantive postal robberies makes it unnecessary to address the defendant's contentions that the Court's jury charge, and the Government's closing argument, problematically suggested the defendant's Section 924(c) convictions could be predicated on conspiracy to rob. Mot. at 50-51. That is, these convictions "eliminate[] any reasonable possibility" that the Section 924(c) convictions were predicated on merely conspiracy and not substantive robbery. *See Gomez*, 2021 WL 3617206, at *3.

To determine whether claims of perjury entitle the defendant to relief for purposes of a collateral challenge, the court must determine "(1) whether false testimony was introduced, (2) whether that testimony either was or should have been known to the prosecution to be false, (3) whether the testimony went uncorrected, and (4) whether the false testimony was prejudicial[.]" *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003). Each of the four pieces of "newly discovered evidence" presented by the defendant fails one or multiple prongs of this test.

First, three of the four pieces of evidence are hearsay from the shooter, Alfredo Gallego, and not competent habeas evidence establishing the falsity of George Gallego's testimony, much less evidence establishing the Government's knowledge of any alleged perjury. Second, even when reviewed for substance, these statements either do not show inconsistencies giving rise to an inference of perjury, or amount to inconsistencies that George Gallego conceded on the stand under cross-examination. Third, as to the fourth category of newly discovered evidence—a police report that allegedly shows that the break-in and lock change at the Bronx Depot requiring the defendant to provide George Gallego keys did not take place until after the murder—the defendant does not explain how the report proves the Government's knowledge of the alleged perjury, nor can he establish prejudice given the defense argued to the jury its theory that there was no break-in or lock change.

## A. The defendant's "newly discovered evidence" consisting of hearsay from the shooter does not constitute competent habeas evidence warranting an evidentiary hearing.

Most of what the defendant has put forward to revive his theory of George Gallego's perjured testimony—three of his four categories of "newly discovered evidence"—amounts to hearsay from the convicted shooter, Alfredo Gallego, in various emails in which Alfredo Gallego also promises to help the defendant as much as possible and conditions his statements on his limited knowledge and limited memory. *See, e.g.*, ECF No. 109 at 69 (2016 Alfredo Gallego

26

email) ("***As for White, I will help him anyway I can. I don't remember*** doing the killing by an indirect order from white [sic]. It was a directive from George, ***which I fulfilled without question***.") (emphasis added), at 70 (2018 Alfredo Gallego email) ("So here's some points that should answer all his questions ***as to what or how i can help [White]*** . . . . ***As far as I knew,*** it was my brother's plan."). Indeed, undermining the argument that these limited assertions establish that George Gallego "probably lied under oath about White's role in the 1993 robbery/murder," Mot. at 24, the defendant acknowledges that this evidence was previously not available because of Alfredo Gallego's years-long dishonesty about his own innocence. Mot. at 63.

The Second Circuit has repeatedly cautioned that a Section 2255 application "must contain assertions of fact that a petitioner is in a position to establish by competent evidence." *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (rejecting unsworn recantation of prior testimony). That is, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice," particularly in circumstances such as these, given "convicted co-conspirators have nothing to lose by writing letters attempting to free those who aided them in their criminal schemes." *Id.* The statements presented are not competent evidence but hearsay statements from a convicted co-conspirator and do not warrant a hearing.

**B. Most of the defendant's "newly discovered evidence" either does not give rise to an inference of perjury or amounts to inconsistencies that George Gallego conceded on the stand under cross-examination.**

Even if the statements from Alfredo Gallego could be considered competent habeas evidence, in substance they either fail to establish inconsistencies giving rise to an inference of

perjury, much less establish the Government's knowledge of perjury, or amount to inconsistencies that George Gallego conceded when cross-examined by defense counsel.

<u>The order to kill the victim.</u>  The defendant alleges "George Gallego falsely testified that the order to kill Guillermo Gonzalez, the postal worker, came from [the defendant]" based on Alfredo Gallego's statements that he had no knowledge that the defendant gave the order.  But there is nothing inconsistent about, on the one hand, George Gallego's testimony that the defendant ordered him to kill the victim, and, on the other hand, Alfredo Gallego's stated memory of receiving the directive, in turn, from George Gallego.  Plainly, George Gallego could have relayed the defendant's directive to Alfredo Gallego, without specifically explaining who had originated the idea of killing the victim.  As the Government noted in its opening statement, the defendant's conduct indicated that he "wanted to conceal his identity from the other participants except George Gallego."  Trial Tr. at 39.

<u>The post-robbery meeting point.</u>   The defendant is similarly unable to establish any inconsistencies giving rise to an inference of perjury regarding the location of the post-robbery meeting.  The defendant alleges that George Gallego falsely testified about a planned post-robbery meeting with the defendant, based on Alfredo Gallego's statement that "The only post-robbery meet [sic] *that I was aware of* . . . was to have been at Hunts Point, Bronx."  Mot. at 64 (citing ECF No. 109 at 74, question 11) (emphasis added).  Again, the fact that Alfredo Gallego was himself unaware of any post-robbery meetings other than the one at Hunts Point does not prove that George Gallego and the defendant did not plan a meetup at Bronx Depot.  At trial, the Government presented corroborating evidence of the planned meetup, including testimony that nobody would be working at the Bronx Depot on the night of the murder, records showing calls

from the Bronx Depot to George Gallego after the murder, and additional records showing calls later that night from the defendant's home to George Gallego.  Tr. 44, 1447-48, 1457-58.

The reason for building the silencers.  As to the defendant's allegation that George Gallego falsely testified that he began building silencers for use in the postal robbery at the defendant's request, the defendant cites as "newly discovered evidence" Alfredo Gallego's statements that George Gallego initially built the silencers to sell.  The defendant then argues that the Government should have known George Gallego was perjuring himself based on what appears to be a Government trial exhibit consisting of notes from a proffer with George Gallego.  Mot. at 64 (citing ECF No. 109, at 77).   The defendant fails to note that the jury was presented with evidence regarding George Gallego's inconsistent statements regarding why he began building the silencers, that the defense was provided the opportunity to cross-examine George Gallego with his own previous statements to the Government, and that George Gallego admitted to inconsistencies.  The cross-examination unfolded, in relevant part, as follows:

> Q: On December the 12th of 1995, you told the government that you had made the silencers. Isn't that correct?
> A: Yes.
> Q: You told them that it took you months to make them, right?
> A: Yes.
> Q: And you told them that you started to make them long before you had any conversations with Al White, didn't you?
> A: I don't recall whether I did or not. I may have.
> Q: Government Exhibit 3574 L, the third page, take a look at this and see if it refreshes your recollection as to what you told the government then about those silencers and their manufacture.
> Q: Have you had a chance to review that?
> A: Yes.
> Q: After reviewing that, sir, did you tell the government that you started to make these silencers before you had any conversations with Mr. White, that it took you months to make them and that you did it for curiosity and for no specific reason?
> A: I believe I said that, yes.

Trial Tr. 851-52.

In short, the Government did not knowingly offer perjured testimony; rather, the evidence presented inconsistencies, and the defense was provided the the opportunity to underscore those inconsistencies for the jury in order to discredit George Gallego.  As this Court explained two decades ago, resolution of such inconsistencies "was a matter of credibility well within the ken of the jury."  *White*, 2000 WL 546426, at *3.  The defendant cannot persuasively argue that the alleged perjury went "uncorrected" or was "prejudicial."  *Shih Wei Su*, 335 F.3d at 127.

Alfredo Gallego's statements do not raise any "detailed and controverted issues of fact that, if proved at a hearing, would entitle [the defendant] to relief."  *Gonzalez*, 722 F.3d at 131.  No hearing is warranted.

**C.  The defendant fails to explain how his remaining "newly discovered evidence" shows the Government knew of any alleged perjury, and in any case, the testimony was plainly not prejudicial.**

Other than Alfredo Gallego's hearsay statements, the only "newly discovered evidence" presented by the defendant is a police report showing that the Bronx Depot suffered a break-in some five months after the murder.  The defendant argues that this report signifies that George Gallego lied when he testified that a break-in before the murder necessitated a lock change, and that the defendant gave him keys to the new lock.  Putting aside the question of whether a break-in after the murder rules out the possibility of a break-in before the murder, the defendant provides no explanation for why the report establishes that the Government should have known George Gallego was committing perjury on this point.  *Salazar-Espinosa v. United States*, No. 11 CIV. 0247 LAK, 2011 WL 2946166, at *3 (S.D.N.Y. July 11, 2011) (rejecting argument that government should have known of a witness's allegedly false testimony based on testimony in another proceeding that did not sufficiently establish falsity).  Rather, during trial, conflicting testimony was presented to the jury regarding the break-in, and defense counsel specifically cast

doubt on George Gallego's account.  During summation, defense counsel explicitly told the jury

that there was no evidence of a break-in necessitating a lock change before the murder, and that

George Gallego already had keys.  *See* Trial Tr. 1513-14 ("The key there . . . is the fact that George

has keys to the warehouse . . . by the way, there was no evidence of break-in, I think the testimony

was somebody had keys.  More reasons to doubt George Gallego's veracity, his honesty.").

The defendant has failed to explain why the Government should have known that George

Gallego committed perjury regarding the lock change, and in any event the defense was permitted

to argue to the jury the insufficiency of the evidence and George Gallego's lack of trustworthiness

on the issue.  Under these circumstances, the defendant cannot show the allegedly false testimony

should have been known to the prosecution to be false, went uncorrected, or was prejudicial.  *Shih

Wei Su*, 335 F.3d at 127.  The police report provides no basis for a hearing.

## CONCLUSION

For the foregoing reasons, this Court should deny the defendant's Motion for a sentence

reduction under 18 U.S.C. § 3582(c)(1)(A)(i) and vacatur and resentencing under 28 U.S.C.

§ 2255.

Dated: New York, New York
       October 6, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:   _____
      Jane Y. Chong
      Assistant United States Attorney
      (917) 763-3172